The first argument this morning is United States v. Saunders Mr. O'Mara May I please the Court? Your Honors, my name is Peter O'Mara. I'm counsel for Appellant Christopher Saunders. This morning I will be discussing the two evidentiary issues before ceding the podium to Ms. Felisa Leisinger, counsel for Appellant Rasheed Bounds, who will argue the sentencing issues. I will first discuss the District Court's admission of the government's fingerprint experts' testimony, then the District Court's admission of evidence of a traffic stop of Mr.'s car and price. Rule 16 keeps the government from hiding the ball. It ensures criminal defendants who are at risk of losing their life, liberty, or property have enough knowledge to put up a fair defense. The government sought to use testimony from their fingerprint expert, Mr. Joseph Ambrosek. Mr. Ambrosek has over 43 years of experience. He's testified in over 200 trials. He has compared known fingerprints to latent prints hundreds of thousands of times. So why didn't the government disclose the one objective quantifiable basis for their experts' opinion that prints on evidence matched the prints of the defendants? Why did the government hide the ball? Had Mr. Saunders known the number of – excuse me – had Mr. Saunders – Did Saunders ask for the appointment of a defense expert? I don't believe that Mr. Saunders did. However, Your Honor – Is that the most sensible way to deal with the prosecutor's fingerprint evidence, for the defense to present its own fingerprint expert? I agree that that's a possibility, Your Honor. But what I would submit is that by not – My question is, isn't that the most sensible thing to do, if there's a doubt about the prosecutor's expert? Defense hires its own expert, analyzes it. Now, of course, the defense expert may agree with the prosecution's expert. But if the defense didn't even ask for the appointment of an expert, I don't see why one can then complain about the prosecution's expert. Your Honor, the complaint is in the level of disclosure. And I would submit that by not knowing the number of Galton points that the government's expert used to make the determination that there was a match, it hindered Mr. Saunders' ability to make a reasonable judgment – No, it didn't hinder his ability. His ability was the ability to ask for an expert and have the expert analyze the same prints and see what the expert thought. And if it turned out there was a difference in the methodology the two experts used, then you can argue at trial that one of them had a better method than the other. Your Honor, I would submit, though, to have a proper rebuttal expert, it would be useful for that rebuttal expert to be able to know what quantifiable means the government's expert used to find those matches and reach the conclusion that he did. There are no cases really out there that support your argument that the number of Galton points used to identify a match must be disclosed, right? You're correct, Your Honor. I found no published cases that speak to the matter directly in any circuit. Your Honors, I would submit that the connection – these prints were of absolute vital importance to the case that the government had against Mr. Saunders and Bounds. It's the only physical evidence that connected the defendants to the crime. The only tangible evidence the jury could have used to corroborate the key evidence that the government used in the case, which was the testimony of three cooperating witnesses admitted criminals with skin in the game. I'd also submit to this court that a new trial is appropriate. The district court had the opportunity to offer a continuance and ordered the government to provide the number of Galton points. Yeah, and just remind me, because I've forgotten, when was the motion in the file in terms of the course of the proceeding? Your Honor, I don't know the exact date, but if I recall correctly, and I apologize, this is from memory, I believe it was several weeks before trial. Right. That's what I thought. I just wanted to make sure it didn't occur right before trial. So the motion in Lemonet was denied. That's correct, Your Honor. And so at that point, why wasn't an expert hired? So you know, perhaps didn't need an expert at the beginning, but why wasn't an expert hired then? I don't know, Your Honor. I was not a trial counsel in the case, and I don't know precisely the calculation. However, I will submit that the court erred by not at least ordering the government at that point, while there are still several weeks to trial, to disclose the number of Galton points, which would have afforded the opportunity to Mr. Saunders to make a reasonable judgment on whether an expert was appropriate. A couple weeks before trial is far too late to engage an expert. That might be true, Your Honor. And at that point, the court could have also offered a continuance to give an appropriate amount of time without delaying too much further. And because Rule 16 allows a number of remedies, and it's true that if the district court would have made the correct decision at this juncture, the new trial remedy may not have been appropriate. But because the trial court failed to make that determination, it makes the new trial appropriate at this juncture. If Your Honors have no further questions on the expert testimony issue, I'll move on to the second. Next, I'll talk about the traffic stop, the evidence the district court admitted about the account of a traffic stop with Mr.'s car in Price. The government's own witness testified that these men's activities had nothing to do with the conspiracy of which Mr. Saunders and Bounds were alleged to be a part. Mr. Saunders wasn't even at the uptop apartment that day. However, if the government is correct and there's some sliver of relevance to this evidence, what did the traffic stop evidence really do? The government brief said that it was admitted to prove that Mr. Price had had a conspiracy, but what does it really show? If there is really overwhelming evidence as the government contends, then this is rendered irrelevant. And if Your Honors don't have any further questions, I'll cede the floor and reserve the remainder of my time for rebuttal. Certainly, Mr. O'Meara. Felicia Leisinger. May it please the Court, Felicia Leisinger on behalf of Defendant Appellant Rashid Bounds. We're asking this Court to find that the district court violated the Sixth Amendment by re-examining the jury's specific fact-finding, considering no additional evidence, and then making its own elevated drug quantity finding. Ms. Leisinger, what are we supposed to do with United States v. Watts? In United States v. Watts, Your Honor, that was founded under Fifth Amendment principles. And in that case, the disparity between... Has the Supreme Court ever questioned Watts since then? Your Honor, I'm not sure I don't... The answer is no. And in fact, Burndy and Booker both distinguish Watts and say there's no problem. Correct. But, Your Honor, in Booker, the issue wasn't that the jury made a specific finding and then the district court at sentencing made a different finding as to that same fact. In Booker, the jury's finding was more than 50 grams. And then the Supreme Court stated that putting a limit on the more than 50 grams was not the same fact that was found by the jury. And here, our jury's verdict specifically found that the conspiracy was responsible for 100 grams to less than 1 kilogram. And so there's no guessing as to what that specific finding means. And then at sentencing, the district court considered no additional evidence within the bounds of what the jury heard, disagreed, and made a separate finding. That, with Booker and Rita... I don't even know what it means to say that he disagreed with the jury. They are different burdens of persuasion. The jury is asked whether something has been established beyond a reasonable doubt. And the judge is asked whether something is established by a preponderance of the evidence. There's no disagreement in saying it didn't meet the reasonable doubt standard and it did meet the preponderance standard. So it seems to me your argument is really a contention that in resolving factual issues pertinent to sentencing, the judge has to use the reasonable doubt standard. That would produce symmetry with what the jury does. Has the Supreme Court ever required a judge to use the reasonable doubt standard at sentencing? No, Your Honor. And in fact, at sentencing, we don't take the position that the preponderance of the evidence standard must be applied. It's that when the jury has made a specific fact finding... The jury has found something is not shown beyond a reasonable doubt. That's the whole point of Watts. The judge can decide by a preponderance that something is true, even though it wasn't proved beyond a reasonable doubt. They're different questions. And that's why I say you're necessarily arguing that the judge has to apply the reasonable doubt standard, which, well, that would be a big change in sentencing law, but not... You can ask the Supreme Court to do that, but it doesn't seem to me the Court of Appeals can do that. Your Honor, in this specific issue, the argument is that the judge should have not been applying a standard at all unless the standard was to overturn the jury's specific fact finding. No, I just don't think you're getting it. There is no overturning a fact finding. The jury determined that the government had not proved something beyond a reasonable doubt. The judge is asking a different question, whether something has been proved by a preponderance. The two answers are perfectly consistent. Your Honor, the Supreme Court has, in its opinions, distinguished that there are facts that are found by the jury and that it is okay for the district court to make separate fact findings that have not been found by the jury. That occurred in Booker and also in Rita. And that is the basis of this argument, that although there are... It is a separate question at different standards of proof at trial and at sentencing. In this case specifically, because there was no additional evidence considered at sentencing and the trial court... But see, that doesn't matter. That doesn't matter at all, as long as the district court's finding was within the statutory range for the defendant's offense. It doesn't matter. Additional evidence doesn't have to be presented for the judge to make that sentencing determination. And you don't have a case that says that, right? You don't have a case that says the judge can't make a finding using the preponderance standard for sentencing unless new evidence has been introduced. Correct. There is no case like that. Correct, Your Honor. But there's also no case that prohibits what we're asking as well. Other than what? Excuse me? You're asking us to disagree with the Supreme Court. We aren't the Ninth Circuit. We don't do that kind of thing. Your Honor, this question is in line with the expansion that the Supreme Court has taken under Appendiana Lane, carving out how the jury's verdict informed sentencing. And this would be one more step in how the jury's specific finding would inform the sentencing court. The sentencing court would have still had discretion within the base levels that the jury's specific finding would have placed the defendants in. But in this case, the district court started out at sentencing at the wrong base level to begin the analysis. So as in Appendiana Lane, where the jury's verdict informs the statutory limits, it makes sense that a jury's specific finding shouldn't be able to be overturned. There shouldn't be a separate finding from the district court when the jury has already made that specific finding. If your honors find that there was no constitutional error here, we ask that this court find that instead the district court didn't properly support its finding with any credible evidence. At sentencing, reviewing the evidence in support of the argued elevated drug finding, the district court questioned the methodologies to calculate any elevated drug finding, asked if he should even circumvent the jury's finding, and then concluded that there would be an elevated drug finding. And Claybrook's requires not there to be a specific calculation or any precisely stated methodology, just simply that reliable evidence be credited. And here, it doesn't naturally follow from the beginning of sentencing as to this issue, where questions regarding whether or not the district court could even go outside of the jury's finding, and then question the methodology, ask if it was speculation, and then concluded that there was an elevated drug finding. There are no further questions, your honor. I will reserve my remaining time for rebuttal. Certainly, counsel. Ms. Ray. May it please the court. Good morning, your honor. Allison Ray on behalf of the United States. I want to begin today by speaking about the evidence for the drug quantity finding. In this case, there was physical evidence that was recovered over six trash pulls during the 20 weeks of the conspiracy period. Specifically, there were trash pulls conducted that recovered 143 Dorman bottles, which there was extensive testimony at trial. You know the word trash is a noun and not an adjective. Understood, your honor. 143 Dorman bottles were discovered, which there was extensive testimony at trial about tying to this heroin conspiracy. The district court relied specifically on those 143 Dorman bottles in reaching its drug quantity finding, and also stated that its drug quantity finding was a conservative one. Specifically, on page 24 of the sentencing transcript, the district court asks the government whether 143 Dorman bottles correspond to 3.69 kilograms of cocaine. When the government responded affirmatively, the court asked the government about the ranges of drug quantities that are used for sentencing guidelines. And when the court received that answer from the government, it concluded that it was comfortable with a 3 to 10 kilogram finding for these defendants. Now, later, the court noted on page 25 of the transcript that it based that finding on all of the evidence of the trial. But reading the transcript, it's clear that the court's finding was specifically tied to that physical evidence that was recovered from the up-top apartment used by defendants and their co-conspirators for the heroin conspiracy. Okay, so let's move now to the Galton points. Why wasn't that disclosed? Because a number of points of comparison provide a basis for the government's expert's conclusion that the prints were met. Yes and no, Your Honor. Galton points were used by the expert as part of his analysis, but as he testified at trial and as the government disclosed in advance of trial in its expert disclosure letter, he used the ACE-V method of analysis. And under the ACE-V method of analysis, first an examiner will look at two prints and decide whether they're similar enough to even pursue comparison for a match. Once that's done, the examiner will look at the two prints and compare them using three different levels of detail. And Galton points are considered the second level of detail. But certainly, even if it was a second level of detail, the defense could challenge that as a basis for the print match and not knowing that prohibited them from a defense strategy. I mean, even if they had hired an expert, if he had known about the Galton points, they would have been in the dark on that. The defense did challenge that as a basis for his conclusions. And I think the problem is not that the expert had a set number of Galton points and chose not to disclose them or the government chose not to disclose them. There was extensive testimony at trial and, again, in the expert disclosure letter, stating that that wasn't really the way that the expert did his analysis. He wasn't looking for a set number of Galton points. Instead, he was doing a holistic analysis under the ACE-V method. And under the ACE-V method, as defendants acknowledged, an expert determines based on his or her experience that sufficient quantity and quality of friction-ridged detail is in agreement between two prints. And so to say that the expert didn't disclose a quantifiable aspect of his analysis is to overlook the fact that Rule 16 requires a summary of the methods and bases for an expert's opinion. And the methods and bases for the expert's opinion in this case were ACE-V. In addition, Your Honors, I'd like to add the fact that even if the Galton points would have assisted the defense in preparing an opportunity to put on a better case, first of all, as Judge Easterbrook noted, they didn't choose to engage their own fingerprint expert. And second of all, there's no showing of prejudice here because there was extensive testimony at trial about the number of Galton points that this expert used, both on direct and on cross-examination. And the thrust of the cross-examination was really about whether there should be a set number of Galton points in the United States. And there was cross-examination about the number of Galton points required in other countries. And this expert repeatedly told the court that there is no standard in the United States and that's not really the way that the ACE-V method is conducted. Instead, the ACE-V method focuses on looking at a print as a whole, using an expert's experience to look at different levels of detail and then to make a holistic determination of whether a match has been found. I have a question. This Dorman? Yes. These are the bottles? Yes. And they're 140-some. Does that correlate with the amount of heroin? I don't know how much. Yes. Like what one bottle would produce as mix or something? Is it multiple? Yes. There was testimony at trial from three different witnesses about the corresponding ratio of Dorman to heroin used for David Price's heroin and the heroin that the defendants were trafficking in this scheme. Specifically, Jonathan Penson testified that the ratio was 13 grams of Dorman to 5 grams of heroin. Mokese Lee testified to that same ratio. And both of them testified to the fact that Price was known for having a very high-quality level of heroin. And that was a key part of the drug trafficking scheme was preserving this ratio and preserving the quality of heroin that defendants used to get the buyers that they needed for their product. So one bottle represents how much? The witnesses testified that just less than one bottle would correspond to about 5 grams of heroin and 18 grams of resulting heroin mixture. James Brown testified that it was between half and a full bottle. That's a big difference. That's why I just wondered if that's an accurate measure when he came up with the amount. Yes. And the district court raised that point at the sentencing hearing and pointed out that, in his words, defendants weren't part of Johnson & Johnson. However, there was extensive cooperator testimony about this ratio that was consistent across all three cooperators. And the amounts that the cooperators stated that they were selling on specific blocks corresponded to the amounts of Dorman that were found in the trash. And so all of the numbers really matched up, according to the cooperator testimony, and gave the court a reason to trust that this 143 Dorman bottles, over only six weeks of a 20-week conspiracy, could produce at least 3 kilograms of cocaine. So that's how you got down from some number like 12 or 14 kilograms? That's assuming over a long period of time, I guess. Yes. The government argued for over 14 kilograms partly by extrapolating out the Dorman bottle evidence. If you had evidence for it, that's when it came up with the three-point something. Yes. If there are no further questions on this issue, I'd like to turn to the traffic stop evidence. This evidence was a key part of showing how the conspiracy operated. With this traffic stop, what the government showed was that David Price and Keith Carr, who were a supplier and a co-conspirator in this scheme, were taking heroin to be tested by a heroin addict in order to evaluate the quality of their product. And as I stated before, the quality of David Price's heroin was a key component of this scheme. So this act of taking heroin out of the up-top apartment, having David Price and Keith Carr found with this heroin in their possession, doing an act in furtherance of the conspiracy, and even more importantly, having defendant Bounds there that same day, on a day that Mokese Lee testified was a working day at the apartment, all shows that this conspiracy was ongoing, that Saunders and Bounds were a part of it, that it was a sophisticated drug business, and that while Saunders and Bounds may have been present at up-top on many occasions, we know on this occasion that it was a drug trafficking day and that mixing was going on at up-top. We have surveillance photos of Bounds leaving up-top, and then we have Price and Carr leaving up-top with sample blows to be taken to a heroin addict. And they measure the potency by how the heroin addict reacts? That's outside the record, Your Honor. It's an interesting tester. Yes. My understanding based on the testimony from trial is that they would call them dope fiends, but they would take a sample to a dope fiend for the dope fiend to evaluate the appeal of the product. If there are no further questions, the government would rest on its brief and just ask that the defendant's convictions be affirmed because the district court did not abuse its discretion in admitting either the expert testimony or the traffic stop evidence. Further, the government asks that the defendant's sentences be affirmed because the district court did not clearly err in making its drug quantity finding, either because of a Sixth Amendment violation or because of a lack of an appropriate methodology or reliable evidence for its finding. Thank you, counsel. Anything further, Mr. Romero? Yes, Judge, just two brief points. Your Honors, the government confuses, with regards to the Galton points, methods and bases. Ace v. is the general method that the expert used to evaluate the prints, but the Galton points are one of the bases that it used to find a match, and they were omitted. Perhaps other details also add to that basis, but Rule 16 demands the bases and reasons plural. That implies all of them, including the Galton points. On the traffic stop, the government calls the traffic stop evidence key and that it's key to show that Bounds and Saunders were involved in the conspiracy. However, it did nothing but really give a salacious and interesting story to the jury. I say I'm out of time. Thank you, Your Honors. Thank you. Ms. Leiser. Your Honors, Watts is distinguishable because the issue there was the acquittal and a double jeopardy. And the Supreme Court decided that that finding was ambiguous because an acquittal can mean many things. Here, our jury's finding is not ambiguous, and that's how I would distinguish Watts from this case at hand. Additionally, the District Court's elevated drug finding is not supported by credible evidence, because if you look at the sentencing transcript as a whole, he first discredits evidence, questions the methodology, and even states that the jury's verdict made a credibility statement as to the main support for the elevated drug arguments, which was the cooperator's testimony, and then later concluded that there was an elevated drug finding. And so, Your Honors, the elevated drug finding, even if there's no Sixth Amendment violation, wasn't supported by or stated with any credible evidence and support. We would ask that you find that there was a violation of the Sixth Amendment or find that the drug quantity was not supported by reliable evidence. Thank you. Thank you very much, Counsel. Mr. O'Mara, Ms. Leisinger, we appreciate your willingness to accept the appointment and the willingness of your law firms as well, and the assistance you've been to the court as well as your client. The case is taken under advisory.